UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

TERRY L TERRY #584134                    CIVIL ACTION NO. 18-cv-812 SEC P

VERSUS                                   JUDGE ELIZABETH E. FOOTE

DARREL VANNOY                            MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

Terry Lynn Terry ("Petitioner") was convicted of three counts of molestation of a juvenile. Caddo Parish District Judge John Mosely sentenced Petitioner to concurrent terms of 15 years on counts one and two, and a concurrent 50-year term on count three. The convictions and sentences were affirmed on direct appeal. State v. Terry, 108 So.3d 126 (La. App. 2d Cir. 2012), writ denied, 118 So.3d 1096 (La. 2013). Petitioner also pursued a post-conviction application in state court. He now seeks federal habeas corpus relief on several grounds. For the reasons that follow, it is recommended that his petition be denied.

### Sufficiency of the Evidence

#### A. Introduction

Petitioner was convicted of molesting three persons. A.L. and T.C. are sisters and the biological daughters of Petitioner and his first wife. They were adults at the time of trial. The adult daughters were estranged from Petitioner after enduring childhood molestation, for which Petitioner was not charged at the time. They became concerned and

contacted a state agency after they learned that Petitioner had remarried and had two young children living in his home. One of those children was S.B., the daughter of Petitioner's nephew. Petitioner was eventually charged with molesting A.L., T.C., and S.B. Petitioner challenges the sufficiency of the evidence to support his conviction of molesting T.C. and S.B.

### B. Adult Daughter A.L.; (Tr. Vol. 2, p. 367)

A.L., the oldest daughter, testified that she was born in 1980 and was 30 years old at the time of the trial in 2010. When she was a child, she lived with her parents, sister T.C., and brother S.T. She said her father began to touch her inappropriately when she was in middle school, sometimes when her mother was away at work. The family then lived on Riding Club Lane in Shreveport, and A.L. shared a bed with her sister.

A.L. testified that Petitioner would touch and fondle her beneath her pajamas while she pretended to be asleep. She also described how Petitioner would have her use soap to rub his penis while he was taking a shower. She said that there were more than five of each such incidents. She also described a time that Petitioner was helping her with her homework and had his hand up her shirt. A.L. said she also engaged in oral sex with Petitioner, and he often "practically begged" to have intercourse, but that never happened. A.L. described a number of other acts of oral and manual stimulation orchestrated by Petitioner, and she said that these events happened before she entered foster care the summer before her freshman year of high school.

**C. Adult Daughter T.C. (Tr. Vol. 3 p. 460)**

T.C. testified that she was born in 1985 and was 25 at the time of trial. She remembered being interviewed as a child and asked about any abuse by her father. At the time, she lied because she did not want him to get in trouble. In about 2004, after T.C. had a child of her own, she called her mother and her sister to express guilt about covering up for her father.

T.C. described for the jury an incident that happened in the family's trailer on Riding Club Lane when she was about four or five. T.C. said she was naked, and Petitioner was sitting on the toilet getting ready to run her bath water. She had one foot in the tub when Petitioner kissed her. T.C. testified that she remembered thinking:

> [H]e should not be kissing me like this, because it wasn't a peck, it wasn't, there wasn't tongue involved, but it was, I remember thinking distinctly even at that age that he should not be kissing me like this, it felt wrong, and then after that, I felt extremely uncomfortable. And I didn't want to look. I didn't understand. You know, I don't really know if he was touching me or not, but I know I went from thinking that he shouldn't be kissing me like this to extremely uncomfortable and what ended up happening to stop it was, I kind of lifted my foot a little bit and the water went under my foot and I slipped. And I remember, you know, whoa, like a little girl and I remember after that I just got in [the] tub.

T.C. was asked to describe the kiss. She answered, "Sensual." She added that it was, "How you might kiss your husband without tongue, you know, slow, soft, and longer than, for what our relationship was, the kiss should not have happened that way, no, sir." She said that she froze and was "extremely uncomfortable," knowing that it was not right. She added that part of her remembers maybe some touching, but she could not tell for sure because she was so uncomfortable.

T.C. recalled an interview with Detective Brooks, in 2008, a couple of years before trial. After reviewing the interview to refresh her memory, T.C. said that she remembered saying that she had "sensations in my vaginal area" but she could not tell for sure if she was touched because she never looked. "I do remember sensations in my vaginal area that made me think that he was touching me, but I never looked." She described the sensation to Detective Brooks as pressure.

**D. Linda Isaac (Tr. Vol. 3 p. 498)**

Linda Isaac is employed by the Department of Children and Family Services. She was a child protection investigator in 1993. She interviewed A.L., then 13, and learned what had been happening to her at home. She also interviewed T.C., who knew that her parents were mad at each other and that it had something to do with what Petitioner had done to her sister, but she did not disclose that she had been abused. Ms. Isaac also talked to Petitioner, who said he had been molested as a child four or five times by someone other than his parents. He admitted molesting A.L. over the course of five years, and he described specific sex acts that were consistent with A.L.'s report.

**E. Youngest Victim S.B.; (Tr. Vol. 4, p. 584)**

Witnesses testified that Petitioner's nephew had three children, including S.B. In 2006, when S.B. was three years old, the children went to live with Petitioner because their mother was having a nervous breakdown. Petitioner was living on Pelican Lodge Road (in Caddo Parish) when the children first moved in. S.B. and one younger brother lived with Petitioner and his wife for 10 months to a year in a trailer in Shreveport. Petitioner and his then wife had sole care of S.B. for a significant period of time. Petitioner then moved to

Mississippi, and S.B. moved as well.  Petitioner was arrested after he and the children had lived in Mississippi for a couple of months.

Crystal Clark (Tr. Vol. 4, p. 645) testified that she is a family advocate/forensic interviewer at the Gingerbread House.  The main purpose of the center is to conduct forensic interviews of children who are suspected of being physically or sexually abused. She interviewed S.B. in June 2008, and a video of the interview was played for the jury.  A transcript is in the record under seal at Doc. 23-5.

S.B. said in the recorded interview that she was four years old and lived with her mother, daddy, and J.B. (her two-year-old brother).  Ms. Clark asked S.B. the names of her family members, and S.B. responded "Terry Terry Terry" each time.  She said she had another brother named N., age 5, but then she said he was her sister and his name was Terry Terry Terry.  S.B. was able to recite the alphabet, with some help, and she was able to identify body parts, including "vagina" and "butt" without prompting.

Ms. Clark asked S.B. if anyone had ever touched her on her vagina, and she said no. Clark asked if anyone ever touched her on her butt, and S.B. nodded yes and said, "My daddy."  She said that her daddy's name was Terry Terry Terry and that he touched her there with his hand, under her clothes, while she was in bed.  She said he pinched and squeezed her there, and he said, "I love you."  S.B. said this happened more than one time.

Ms. Clark then asked S.B. about another part of her body, and S.B. said that he "squeezed me and pinches me right there," indicating an area that she said was called her vagina.  She said it happened more than once and was done under her clothes while she was "asleep."  Ms. Clark asked S.B. if anybody else pinched or squeezed her on her vagina

or butt besides her dad, and S.B. answered, "My dad."  She said that he used his hand to make the contact.  S.B. said that her mother, who she again called Terry Terry Terry, was at home and asleep when these things happened.

Ms. Clark interviewed S.B. again the next day (Doc. 23-6) to determine whether the touching she described happened in Louisiana or Mississippi.  S.B. was asked where she said Mr. Terry Terry touched her, and she repeated her claims that he squeezed and pinched her butt and vagina.  S.B. said that they had a trailer in Mississippi and "here" in Caddo Parish.  She was asked if Terry Terry touched her "in Mississippi and here," and she nodded yes.

S.B. was six when she testified at trial.  Tr. Vol. 4 p. 584.  She identified her parents as Jonathan and Michelle and said she had two brothers, N. and J.  The recordings of the Gingerbread House interviews were played, and S.B. said that everything she said in the videos was the truth.  She admitted on cross-examination that she was not correct when she told Ms. Clark that Terry Terry Terry was the name of her mother and father.  She also said that she was living in a trailer in Mississippi when these things happened.  Defense counsel asked if when she said on the video that Terry Terry Terry were her mother and father, she meant Michelle and Jonathan.  S.B. agreed.  Defense counsel then asked, "So when you said Terry Terry Terry did things to you, you meant Jonathan?"  S.B. replied, "Yes, sir."

On redirect, S.B. clarified that her parents were Michelle and Jonathan.  She was asked, "Who is Terry Terry Terry?" She answered, "My … my daddy's brother."  But she said she never lived with Terry Terry Terry.  The prosecutor referred to the video where S.B. said Terry Terry Terry was doing certain things to her, and she asked S.B., "Now,

who do you mean when you said 'Terry Terry Terry'?"  S.B. replied, "Jonathan."  She was also asked if she had ever called Terry Terry Terry "daddy," and she said yes.  S.B. repeated on re-cross that when she said Terry Terry Terry did things to her that she meant Jonathan.

### F. Dr. Ann Springer (Tr. Vol. 5, p. 779)

Dr. Ann Springer is a pediatrician at LSUHSC who specializes in child abuse medicine.  She examined S.B. in June 2008 when the child was age four.  Dr. Springer was told that the child disclosed at the Gingerbread House that a great uncle squeezed and pinched her behind and vagina.  Her examination found chronic redness and irritation of the vulva and labia, secondary to poor hygiene, chronic yeast infection, and tissue separation of the hymen that was consistent with sexual abuse and digital penetration.

### G. Other Witnesses

Several other witnesses testified for the prosecution and defense.  S.B.'s mother testified that she believed the medical evidence was being fabricated and S.B. was telling "kid stories" or had been coached.  The child's father also said he did not believe Petitioner did anything wrong to S.B.  Detective Brooks testified about going through old case files that showed that in 1993, when A.L. was 13, Petitioner confessed to molesting her for five years.  A case worker from the 1993 investigation told Brooks that Petitioner had been remorseful and tearful, and they did not think he would reoffend, so they did not call the sheriff's office.  The agency's plan was for Petitioner to not come back to the family home, but he was later found there when the agency made an unannounced visit.  The girls were then removed from the home.  Brooks testified that she was unable to get Petitioner to cooperate with the current investigation.

Petitioner's current wife testified that three children, including S.B., began living with them in 2006. Several other adult and minor relatives also lived with them at times. She said she was home every day and that nothing happened to S.B. while she was in their home. She also said that her house was meticulous and that the children were clean while they lived with them. Petitioner's sister said she was not uncomfortable with him being around S.B. because she knew he did not do what he was accused of doing. Petitioner's former girlfriend testified that she lived with him from 1995 to 2000. They received a letter during that time from A.L. that accused Petitioner of molestation. The girlfriend asked her daughter whether Petitioner had ever touched her inappropriately, and the girl said no. The girlfriend's daughter gave similar testimony at trial.

**H. Petitioner (Tr. Vol. 6, p. 925)**

Petitioner testified about his family's history and said that he never did anything with A.L. "other than running some baths." He attributed the 1993 investigation to A.L. getting mad at him after he told her that she could no longer date a certain boy. He submitted to a psychiatric evaluation and ultimately agreed to do whatever the agency wanted because he was told that he was facing 20 years to life. He said the case plan was for him to leave the home, and he and the child would receive counseling. He specifically denied T.C.'s claim that he passionately kissed her, and he denied touching her vaginal area.

Petitioner said that he and his current wife took in his nephew Jonathan's children when the parents were having a difficult time, with the understanding that the parents

would get the kids back.  One of those children was S.B.  Petitioner denied that he ever molested S.B. or performed any other lewd, lascivious act on the child.

Petitioner said that he had been working all around the country on various construction projects.  He was in Iowa when he got word that there was a warrant for his arrest.  Within three days, he quit his job, packed their belongings, and drove back to Shreveport, where he promptly turned himself in to the sheriff.

On cross-examination, Petitioner said that the investigators and physician who testified against him disliked him because of the nature of the charges against him.  He said that Ms. Isaac, the investigator from the first investigation, was lying when she wrote in her report that he admitted to molesting A.L.  Petitioner conceded, however, that he confessed in juvenile court and submitted to a case plan.  He contended that A.L. testified against him in the 2010 trial because she was still mad that he would not let her see her boyfriend in 1993 (even though she was married to another man by the time of trial).  He claims that A.L. made up her allegations because of a "whooping" he gave her when she refused to change clothes and cussed him out.  There was testimony from A.L. and T.C. that they went to see Petitioner in jail, and he apologized to A.L. for what he had done to her.  Petitioner denied that was what he said he was sorry for, and they were lying if they said otherwise.  His son testified that Petitioner admitted that he molested A.L. and had done so because his parents also molested him.  Petitioner testified that he never said that to his son.

### I. Petitioner's Burden

Petitioner argued on direct appeal that the evidence was insufficient to support his convictions on counts two (T.C.) and three (S.B.). In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

### J. Count Two; T.C.

Petitioner was convicted of molestation of a juvenile, as defined in La. R.S. 14:81.2(A) as the "commission by anyone over the age of seventeen of any lewd or

lascivious act upon the person or in the presence of any child under the age of seventeen … with the intention of arousing or gratifying the sexual desires of either person, … by the use of influence by virtue of a position of control or supervision over the juvenile." Petitioner argues that the State did not prove that he used influence by virtue of his position, that the evidence did not show that the offense occurred within the date range charged in the bill of information, and that the State did not prove that the kiss described by T.C. was a lewd and lascivious act. The State contends that the third argument was not exhausted because it was not included in a petition to the Supreme Court of Louisiana, which makes it procedurally defaulted. The procedural bar defense may be valid, but the court may elect to skip the defense and deny a claim on the merits. King v. Davis, 883 F.3d 577, 585 (5th Cir. 2018). That course will be followed here.

Petitioner first argues that there was insufficient evidence to find that he used influence by virtue of a position of control or supervision over T.C. The state appellate court help that the State presented sufficient evidence on this element. It noted that Petitioner was T.C.'s biological father, still married to her mother, and living with the family. He was often the only parent at home with the children while his wife worked a night shift. He was clearly in a supervisory capacity as he gave T.C. her bath, which is when the offense occurred. State v. Terry, 108 So.3d at 143.

This issue was adjudicated on the merits in the state court, so habeas corpus relief is available only if that decision was an objectively unreasonable application of the deferential Jackson standard. Petitioner argues that the "use of influence" element is the functional equivalent of a non-physical use of force and that more than simply having a

position of supervision or control is required; the offender must actually use the influence to accomplish the act. Even if Petitioner is correct on this point of law, the evidence showed that the child's father employed his supervisory role as a parent to gain access to the naked child as he drew her bath. The state appellate court's decision might be debatable, but it was not an objectively unreasonable application of Jackson to the facts presented to the jury.

Petitioner argues that his kiss was not a lewd or lascivious act within the meaning of the statute. The state appellate court noted that whether an act is lewd or lascivious depends upon the time, place, and all circumstances surrounding its commission, including the actual or implied intention of the actor. State v. Terry, 108 So.3d at 143. Petitioner argued to the appellate court that a sensual kiss of a four or five-year-old girl when he was giving her a bath was insufficient, alone, to satisfy the element. The court responded that there was more than just the kiss. T.C. testified that she was naked and stepping into the bathtub when Petitioner kissed her passionately and possibly touched her vaginal area (as reflected by her testimony that she recalled a type of sensation in her genital area). The court determined that it was reasonable for the jury to conclude that the kiss, in these circumstances, was a lewd and lascivious act. Id.

Petitioner contends that he was charged based on a probable cause affidavit that alleged French kissing, but the victim never testified that there was French kissing, and she said there was no tongue involved. An affidavit in support of a warrant does not require that the State prove its precise contents to obtain a conviction. The statutory elements are what are at stake. Petitioner also urges that the lack of evidence of a French kiss means he

was charged without probable cause.  That would not matter because "illegal arrest or detention does not void a subsequent conviction."  Gerstein v. Pugh, 95 S.Ct. 854, 865 (1975).  See also Montoya v. Scott, 65 F.3d 405, 421 (5th Cir. 1995).

Petitioner also focuses on State v. Louviere, 602 So.2d 1042 (La. App. 4th Cir. 1992), where a 72-year-old neighbor attempted to kiss two nine-year-old girls.  One clenched her teeth to resist his tongue, and the other said the kiss was not unlike one from her granny's stepmother who had no teeth.  The appellate court found that this attempted French kiss, with no indication of any other action planned, fell short of the statutory element of a lewd or lascivious act.

Louviere is not controlling, and its facts are distinguishable.  The children in that case were clothed, and neither described the kiss as sensual or involving any possible touching of the genitals.  Petitioner may have had a reasonable argument to present the appellate court, but the court reviewed the evidence and applicable law and determined that the lewd or lascivious act element was met in this case.  The result might have been debatable on appeal in the state court, but habeas relief is not permitted because the state court's decision is far from an objectively unreasonable application of Jackson to the review of the jury verdict.

Petitioner makes a one-sentence argument that the evidence on count two was insufficient because T.C. was unable to state when the offense occurred, and the time range she provided means the offense may have occurred before the beginning of the date range described in the bill of information (1990-1994).  The state appellate court found no merit in this argument because T.C. testified that she remembered the incident occurred in the

trailer on Riding Club Lane around 1990 to 1991.  State v. Terry, 108 So.3d at 143-44. Petitioner has not demonstrated that this was an objectively unreasonable application of Jackson to the facts presented.

### K. Count Three; S.B.

Petitioner argues that the evidence is insufficient to convict him of molestation of S.B. because the State did not prove that he was the person who committed the acts described by the child in her Gingerbread House interview.  Petitioner notes that the child described every member of her family as Terry Terry Terry during the interview and suggested that her biological father, Jonathan, was the one who touched her.  The appellate court acknowledged that there was some testimony by S.B. where she referred to both Jonathan and Petitioner as her dad, but the court found that she sufficiently identified Petitioner to overcome any alleged confusion.  Specifically, she stated that the acts occurred while she was living with Petitioner.  State v. Terry, 108 So.3d at 144.

"[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." Cavazos v. Smith, 132 S. Ct. 2, 4 (2011).  "The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  Id.  And "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  Id.

S.B.'s testimony and Gingerbread house statement did contain ambiguities and even inconsistencies.  But the jurors were able to view S.B. in person and watch the video, which allowed them to witness the child's body language and hear any oral nuances in the tone

or meaning of her statements.  The jurors then assessed the child's credibility and the weight of her testimony.  They elected to accept the child's contention that it was Petitioner who performed the acts, while the child was living with him, and there was evidence to support that conclusion.

The appellate court applied the deferential <u>Jackson</u> standard and determined that the verdict could not be overturned based on sufficiency of the evidence.  Habeas relief is likewise unavailable given the demanding standard of Section 2254(d).  To the extent Petitioner challenges the credibility of S.B., "under <u>Jackson</u>, the assessment of the credibility of the witnesses is generally beyond the scope of review."  <u>Schlup v. Delo</u>, 115 S.Ct. 851, 868 (1995).

Petitioner also argues that the evidence was insufficient to show that a lewd or lascivious act was committed on S.B.  The appellate court acknowledged this argument, noted that S.B. described how Petitioner touched and pinched on her vagina, and generally determined that the evidence was sufficient to support the conviction.  The court did not specifically discuss whether the touching and pinching met the definition of a lewd and lascivious act, but "Section 2254(d) applies even where there has been a summary denial." <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1402 (2011).  "There is no text in the statute requiring a statement of reasons" by the state court.  <u>Harrington v. Richter</u>, 131 S.Ct. 770, 784 (2011). The touching and pinching of her private areas, as described by S.B., was sufficient to allow a rational juror to determine that they were acts intended to arouse or gratify the sexual desires of Petitioner.  There was certainly no innocent explanation for such actions.

The state court's decision on this issue withstands review under Section 2254(d), so it is recommended that the petition be denied at to this issue. But Petitioner has made an adequate showing of a potential constitutional violation on this claim to warrant appellate review. It is, therefore, also recommended that Petitioner be granted a certificate of appealability under 28 U.S.C. § 2253(c) with respect to the sufficiency of the evidence on count three, molestation of S.B.

Petitioner next argues that there was insufficient evidence that the actions happened in Louisiana rather than Mississippi. The state appellate court noted that the place of the crime is not an element of the offense, and the remedy for a defendant who believes he is charged with an offense that occurred outside of the court's venue is to file a pretrial motion to quash. Petitioner did not file such a motion, so his objection to the issue of venue was not reviewable. Even if the issue had been preserved, the court said, there was testimony by witnesses to establish that some or all of the criminal acts against S.B. happened in Caddo Parish. The location the child described in her video interview, as well as testimony from the child's mother, established that the acts occurred while Petitioner and the children lived in Caddo Parish. State v. Terry, 108 So.3d at 144-45. This determination is supported by the evidence, so habeas relief is not available.

**Other Crimes Evidence; Kidnapping**

### A. Background Facts

Detective Dorothy Brooks stated during her testimony that a woman accused Petitioner of kidnapping her. This issue was explored outside of the presence of the jury, and the court admonished the jury to disregard the evidence. Petitioner argues that the trial

court erred in allowing the State to present false evidence of other crimes, the admonishment to the jury was an insufficient remedy, and defense counsel was ineffective for failing to move for a mistrial.

Detective Brooks was asked about Petitioner's arrest. She said that he was supposed to come to her office for a meeting. He called maybe twice, but he never showed up. The prosecutor asked at what point Petitioner was arrested. Brooks answered:

> I obtained a warrant for him. And I think he was arrested in some other state because he left town. And as a matter of fact, I talked, I can't even remember the name, I don't know if it was a state trooper, but the guy told me that Mr. Terry was with the some [*sic*] lady. And the lady—they stopped at a store, and she went in the store and handed them a note saying that he had kidnapped her or something. And that was how we got Mr. Terry, found out where he was at and then he turned hisself [*sic*] in.

Tr. Vol. 5, p. 740-41.

On cross-examination, defense counsel began to ask about the police officer from another jurisdiction. The prosecutor asked for a sidebar, after which Brooks was questioned outside the presence of the jury. Brooks explained that "we got a call" from who she believes was a state trooper, not from Louisiana, who told her that a woman that Petitioner had picked up somewhere along the line came in a store and handed over a note that said she had been kidnapped. Brooks said she did not include this in any of her reports because it happened outside of her jurisdiction. She admitted that she probably should not have mentioned it in her testimony. After some discussion, the prosecutor told the court that no more allegations of kidnapping or any other crimes were going to be mentioned, and he acknowledged that Petitioner did voluntarily turn himself in. Defense counsel, Joseph Clark, said he would "yield to the court to admonish this witness." The court did

admonish Brooks not to refer to any alleged kidnapping or to discuss Petitioner's arrest other than to say that he voluntarily surrendered himself. With input from defense counsel and the prosecutor, the court then admonished the jury:

> The Court: All right. Ladies and gentlemen of the jury, first of all, I apologize for the inconvenience, but let me admonish you that there are no allegations or any evidence of any kidnapping involving this defendant in the State of Louisiana or outside the State of Louisiana. In addition, upon learning of his arrest, the defendant voluntarily returned to Louisiana and turned himself in.

> (Sidebar discussion.)

> The Court: All right. Ladies and gentlemen, let me further admonish you that there are no allegations or evidence that he was running from the State of Louisiana to avoid prosecution. So with those two things that I have admonished, you are to disregard any testimony or any evidence of such allegations. Thank you very much.

## B. Knowing Use of False Evidence

Petitioner first argues that it was error for the State to solicit false evidence of other crimes through Detective Brooks when the prosecutor knew that Petitioner turned himself in. "[T]he Due Process Clause is violated when the government knowingly uses perjured testimony to obtain a conviction." Kinsel v. Cain, 647 F.3d 265, 271 (5th Cir. 2011), citing Napue v. Illinois, 79 S.Ct. 1173 (1959). To establish a denial of due process through the use of perjured testimony, a petitioner must show "that (1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false." Reed v. Quarterman, 504 F.3d 465, 473 (5th Cir. 2007).

The transcript shows that the prosecutor did not solicit this testimony. The kidnapping matter was not reflected in the reports, so it was perhaps not even known to the prosecutor. In any event, once Brooks mentioned the matter without prompting, the prosecutor quickly called for a bench conference that led to the admonishment of Brooks and the jury. When Petitioner raised these issues on direct appeal, the appellate court noted that the State "did not ask the witness to elaborate on the allegations" and requested a bench conference to address the matter. The court found the assignment of error to be without merit. There is no basis for habeas relief with respect to this claim, given the complete lack of indication that the prosecutor knowingly presented false testimony.

### C. The Admonishment

Petitioner argues that the court's admonishment to the jury was insufficient to remedy the prejudice caused by the comment. Petitioner's argument relies on Louisiana Code of Evidence articles, but federal habeas corpus relief does not lie for errors of state law. Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011). Petitioner has not demonstrated that he has a properly exhausted and meritorious federal constitutional claim based on the alleged inadequacy of the admonishment.

### D. Ineffective Assistance of Counsel

Petitioner argues that defense counsel rendered ineffective assistance of counsel when he did not object and move for a mistrial. To establish ineffective assistance of counsel, Petitioner must demonstrate both deficient performance by his trial counsel and prejudice resulting from that deficiency. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). To show that his trial counsel's performance was deficient, he must show that his

attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., 104 S.Ct. at 2064. To demonstrate prejudice from his trial counsel's deficient performance, he must show that his attorney's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

Petitioner argued various ineffective assistance claims in his post-conviction application. The trial court summarily rejected them as unsupported allegations that did not meet Petitioner's burden of proof. Tr. Vol. 8, p. 1660-64. The appellate court denied a writ application "on the showing made." Tr. Vol. 9, p. 1839. The Supreme Court of Louisiana denied a writ application in a per curiam opinion that stated Petitioner "fails to show he received ineffective assistance of counsel under the standard of Strickland" and failed to satisfy his burden with respect to his other claims. Tr. Vol. 9, pp. 1886-87.

It is debatable whether Petitioner properly exhausted his state court remedies with respect to this particular Strickland claim. Rather than explore the procedural history, it suffices to say that Petitioner has not presented a meritorious Strickland claim on this point. Defense counsel do often move for a mistrial when prejudicial evidence is mentioned, but courts routinely deny such motions and instead issue an admonishment to the jury. It is almost certain that any motion for mistrial in this instance would have likewise been denied. Nothing would have resulted beyond the admonishment that the court issued. Counsel was not acting outside the range of competent performance when, instead of moving for a mistrial, he attempted to obtain a suitable admonishment that clarified there was no evidence of any kidnapping and that his client turned himself in voluntarily.

**Amendment of Bill of Information**

The bill of information charged that Petitioner committed "Molestation of a Juvenile, 3 Counts 14:81.2(A) & (C) (counts 1 and 2) & 14:81(A) (C) & (E)(1) (count 3)." The bill then set forth facts related to each count. During the trial, the prosecutor stated that defense counsel had informed him that the statute cited for count three was missing the ".2" part of the citation, so the State moved to amend the bill to correct the technical defect. Defense counsel stated that this was "without objection." The court granted the request.

Petitioner argues that the court committed reversible error when it allowed the State to make this amendment. He presented this claim in his post-conviction application. The trial court reviewed state law that allows the court to at any time amend the charge to correct defects or imperfections. The court held that it was "evident that this was a technical defect, such that the trial court did not err in allowing the State to amend the indictment." Tr. 1660-61. Writ applications with respect to this issue were summarily denied by the higher state courts.

The sufficiency of a state indictment or bill of information is not a matter for federal habeas corpus relief unless it can be shown that the charging instrument "is so defective that the convicting court had no jurisdiction." Morlett v. Lynaugh, 851 F.2d 1521, 1523 (5th Cir. 1988). For a charging instrument to be fatally defective, no circumstances can exist under which a valid conviction could result from facts provable under the instrument. State law is the reference for determining sufficiency and if the issue "is presented to the highest state court of appeals, then consideration of the question is foreclosed in federal

habeas corpus proceedings." Morlett, supra. See also Wood v. Quarterman, 503 F.3d 408, 412 (5th Cir. 2007); McKay v. Collins, 12 F.3d 66, 68-69 (5th Cir. 1994). And "[a]n issue may be squarely presented to and decided by the state's highest court when the petitioner presents the argument in his application for postconviction relief and the state's highest court denies that application without written order." Evans v. Cain, 577 F.3d 620, 624 (5th Cir. 2009). The charging instrument in this case was presented to the state's highest court, so there is no basis for habeas relief with respect to this issue.

Petitioner makes the related claim that counsel rendered ineffective assistance with respect to this issue. The state courts summarily denied petitioner's Strickland claims. The state courts found no merit in the argument that the bill was improperly amended, so counsel cannot be deemed ineffective for failing to press a meritless issue. "[C]ounsel is not required to make futile motions or objections." Garcia v. Stephens, 793 F.3d 513, 525 (5th Cir. 2015), quoting Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990).

**Miranda Claim**

Petitioner argues that it was error to allow a child protection investigator to testify about statements Petitioner made during the 1994 investigation because Petitioner made the statements without a waiver of Miranda rights. Petitioner identifies that investigator as Jales Washington, but the portion of the transcript he quotes from at length is from the testimony of Linda Isaac.

Ms. Isaac testifies (Tr. Vol. 3, p. 498) that in 1993-94 she was employed by the Department of Children and Family Services as a child protection investigator. She described how the agency received a hotline tip of abuse, and she began an investigation

by speaking to a school counselor, A.L., the mother, and Petitioner.  She conducted the interview of Petitioner at her office in the state office building, after calling him and asking him to come in at a particular time.  Only Isaac and Petitioner were in the room.  Isaac testified that Petitioner admitted that he had been molesting A.L. for five years, and he described oral sex and fondling in some detail.  Petitioner said that he was going to try to stop abusing the child and planned on going to a counselor.

Ms. Isaac testified that she prepared a report and, consistent with the protocol at that time, referred the matter to family services for the development of a case plan.  Isaac was asked if, in 1994, she was required to call the police if someone confessed to abuse.  She said they "didn't have to call the police" and would not if the abuser was removed from the home and appeared to be going along with the case plan requirements.

Defense counsel asked Isaac if she told Petitioner that he had the right to an attorney or the right to remain silent.  She said, "No, I didn't read the Miranda rights because I am not a police officer."  She explained that "we don't read those not even to this day."  She said that she could not have arrested Petitioner if she wanted to and did not consider herself a criminal investigator.  Rather, her purpose was to provide services to youth and families.  She said that, under the protocol in 1994, they would report to the D.A.'s office the validation of the case, but that report would not provide details.

Petitioner raised this argument in his post-conviction application.  The last reasoned state court opinion is from the trial court.  The habeas court looks through the unexplained writ denials that followed and affords deference to the trial court's explanation for the denial of this claim.  Wilson v. Sellers, 138 S. Ct. 1188 (2018).  The trial court explained

that the claim lacks merit because a child protection officer does not act as a law enforcement agent who is required to administer <u>Miranda</u> warnings.  Tr. Vol. 8, p. 1663. The court cited <u>State v. Bernard</u>, 31 So.3d 1025 (La. 2010), which addressed a similar situation.

The Court held in <u>Miranda v. Arizona</u>, 86 S.Ct. 1602, 1612 (1966) that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  It added, "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  <u>Id</u>.

The Louisiana Supreme Court held in <u>Bernard</u> that <u>Miranda</u> did not apply to a child protection worker who had no authority to make an arrest and was not asked by police to interview the defendant.  The worker did not conduct the interview to investigate criminal allegations, nor were any charges brought as a result of her report.  Other courts have also held that child protection service investigators are ordinarily not required to administer <u>Miranda</u> warnings.  <u>People v. Keo</u>, 40 Cal. App. 5th 169, 253 Cal. Rptr. 3d 57 (2019); <u>State v. Jackson</u>, 116 NE 3d 1240 (Ohio 2018).

The state court denied this claim on the merits.  Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the

United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

Petitioner has not pointed to any clearly established federal law, as decided by the Supreme Court, that is in conflict with the state court's decision.  Ms. Isaac was not a law enforcement officer, and the record does not indicate that Petitioner was in custodial interrogation within the meaning of Miranda when she questioned him.  Habeas relief is not available on this claim, nor is it available on Petitioner's related claim that counsel rendered ineffective assistance of counsel by not moving for a mistrial.  The motion for a mistrial would have lacked merit under Bernard, decided several months before the trial, so counsel was not ineffective in this regard.

**No Expert Witness**

Dr. Ann Springer testified for the prosecution that S.B. had poor hygiene and had tears in her hymen.  Petitioner argues that defense counsel was ineffective because he did not use funds (allegedly) granted him by the court to hire an expert witness to rebut that testimony.  He points to the testimony of the child's mother, who suggested that other physicians did not make such findings.  The mother was asked her reaction to hearing that there was physical evidence of tears in S.B.'s hymen.  She said that she did not believe it.  When asked why, this exchange followed:

A:   I had took her to a doctor's after I heard this.

Q:   You did?

A:   Yes, sir, I did.

Q:    And what doctor did you take her to?

A:    I took her to Dr. Lococo and Dr. Taylor in Vivian.

Q:    Did you provide any reports from those doctors - -

A:    Yes, sir, I did to Mr. Clark (defense counsel).

Tr. Vol. 4, p. 617.  The child's father said he was upset when he first heard the allegations and "thought they had evidence," but "the two doctors that examined her afterwards said that there was no evidence."   Tr. 684.   Petitioner submitted with his post-conviction application a note from Dr. Lococo that said:

> "On behalf of Mr Terry Terry, I never received any calls or requests for any information concerning Mr Clark's findings.  I did not receive a summons to appear in court.  Regarding Mr Terry's children, they were brought to Dr's appointments and were neat in appearance."

The trial court rejected all ineffective assistance claims as unsupported allegations on which Petitioner had not met his burden of proof.  Tr. Vol. 8, p. 1661.

"Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain."  Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010).  A petitioner who makes such a claim must demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the proposed testimony, and showing that the testimony would have been favorable to a particular defense.  Id., citing Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009).  See also Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000) (reversing grant of habeas relief for lack of such a showing).

The trial testimony and the note from Dr. Lococo contain no details about what the physicians found.  The witnesses suggest that they found no evidence of abuse, but the Lococo note gives no indication of the actual findings.  S.B.'s mother stated that she provided defense counsel with copies of reports, but there is no indication that any such reports are in the record.  Given the lack of information about the content of the proposed testimony from the physicians, the undersigned cannot find that the state court's denial of this claim was an objectively unreasonable application of Strickland to the facts presented.

**Extension of Limitations Period**

Petitioner argues that the state court should have granted a motion to quash count one (A.L.) because the statute of limitations expired and was later extended.  The state argues that Petitioner raised a similar claim in a pro se appeal brief but did not assert the federal claims he now raises and did not present any claim about the denial of a motion to quash in his writ application to the Supreme Court of Louisiana.  The State contends that he also did not include the claim in his post-conviction application filed in the trial court, although he did include it in writ applications to the appellate and supreme courts.  The State raises exhaustion and procedural bar defenses based on those proceedings.  The defenses may be well founded, but the claim can also be denied on the merits.

The state appellate court explained that, at the time A.L. was abused, the limitations period for molestation of a juvenile was 10 years from when the victim attained the age of 18.  A.L. turned 18 on January 31, 1998, meaning the limitations period would not expire until January 31, 2008.  The code article that provides for the limitations period, La. C.Cr.P. Art. 571.1, was amended in 2005, before that period of limitations would have run.  The

amendment increased the limitations period to 30 years from when the victim attains the age of 18. The prosecution was commenced in October 2008, within that time.

The appellate court cited authority for the proposition that the State's right to prosecute is retained until the statute of limitations has run, and until it does run it may be extended at the will of the State. State v. Terry, 108 So.3d at 152-53. Petitioner argues that the limitations period expired before the legislature extended it. The appellate court set forth a detailed timeline that indicates the limitations period did not run before the legislative extension. Petitioner does not explain how the court was incorrect.

The Supreme Court has held that extensions of expired statutes of limitation would violate the Ex Post Facto Clause. Stogner v. California, 123 S.Ct. 2446 (2003). But the Court specifically stated that its holding did not affect the many decisions that have upheld extensions of unexpired statutes of limitation. Id. at 2453. Petitioner has not cited any Supreme Court decision or other clearly established federal law that would prohibit the legislative extension of the unexpired limitations period that applied to his case.[1] The state court's denial of this claim does not allow for habeas relief.

---

[1] Petitioner does invoke State ex rel. Nicholson v. State, 169 So. 3d 344 (La. 2015), which addressed a legislative extension of the limitations period for sex crimes when the offender's identity is established through DNA testing. The court held that the new law could not apply retroactively to the defendant. The key distinction is that in Nicholson the offenses in question had prescribed about three years *before* the legislature enacted the DNA provision. The court cited Stogner and held that the new law could not revive the prescribed charges. Nicholson, therefore, does nothing to help Petitioner, whose limitations period had not expired before it was extended.

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied; and

It is further recommended that a certificate of appealability be granted as to the sufficiency of the evidence on count three (molestation of S.B.) pursuant to 28 U.S.C. § 2253(c)(1).

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.   See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court

to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 2nd day of July, 2021.

Mark L. Hornsby
U.S. Magistrate Judge